IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| KIRK HARRINGTON | ) | CASE NO. |
| 5725 Echo Road | ) | |
| Columbus, Ohio, 43230 | ) | JUDGE: |
|               Plaintiff, | ) | |
| | ) | |
|         v. | ) | **COMPLAINT FOR DAMAGES** |
| | ) | |
| JOSE M. PLEHN-DUJOWICH, a.k.a. | ) | **JURY DEMAND ENDORSED** |
| JOSE M. PLEHN | ) | **HEREIN** |
| 15526 Oceanside Way | ) | |
| San Leandro, California, 94579 | ) | |
| | ) | |
|    -and- | ) | |
| | ) | |
| BRIGHTQUERY, INC. | ) | |
| 2901 West Coast Highway, Ste 200 | ) | |
| Newport Beach, California, 92663 | ) | |
| | ) | |
|      **Serve Also:** | ) | |
|      Incorporating Services, Ltd, | ) | |
|      Statutory Agent | ) | |
|      3500 South Dupont Hwy | ) | |
|      Dover, Delaware, 19901 | ) | |
| | ) | |
|    -and- | ) | |
| | ) | |
| BIZQUALIFY, LLC | ) | |
| c/o Jose M. Plehn-Dujowich | ) | |
| Statutory Agent | ) | |
| 15526 Oceanside Way | ) | |
| San Leandro, California, 94579 | ) | |
| | ) | |
|               Defendants. | ) | |

      Plaintiff, Kirk Harrington, by and through undersigned counsel, as his Complaint against

Defendants, states and avers the following:

## **PARTIES.**

1.    Harrington is a resident of the city of Columbus, county of Franklin, state of Ohio.

2.    Harrington is a former employee of Defendants.

3.  BizQualify, LLC is a California Limited Liability Corporation with its principal place of business located in Newport Beach and/or San Leandro, California.

4.  Bright Query, Inc. is a Delaware corporation with its principal place of business located in Newport Beach, California.

5.  Plehn-Dujowich is and was at all times referenced herein the president, co-owner, and/or principal of Bright Query and BizQualify.

6.  Bright Query is a successor to BizQualify for the purposes of liability under the FLSA and/or jointly employed Harrington along with BizQualify.

## PERSONAL JURISDICTION.

7.  Defendants Plehn-Dujowich and BizQualify hired citizens of the state of Ohio and contracted with companies and persons in Ohio, including Harrington. As such, the exercise of personal jurisdiction over Defendants comports with due process.

8.  Harrington resided in Cleveland, Ohio, at all times referenced herein.

9.  Harrington performed work for Defendants in this judicial district and/or was hired out of this district.

10. This Court has personal jurisdiction over Bright Query in that it is a successor and/or alter ego for BizQualify. See E*st. of Thomson ex rel. Est. of Rakestraw v. Toyota Motor Corp. Worldwide*, 545 F.3d 357, 362 (6th Cir. 2008)( "it is compatible with due process for a court to exercise personal jurisdiction over an individual or a corporation that would not ordinarily be subject to personal jurisdiction in that court when the individual or corporation is an alter ego or successor of a corporation that would be subject to personal jurisdiction in that court").

11. This cause of action arose from or relates to the contacts of Defendants with Ohio residents, thereby conferring specific jurisdiction over Defendants.

2

## SUBJECT MATTER JURISDICTION AND VENUE.

12. This action arises under 29 U.S.C. § 201 et seq. in relation to Defendants' failure to pay Harrington at least the minimum wage for work he performed for Defendants. Accordingly, this Court has federal question jurisdiction under 28 U.S.C. §§ 1331 and 1343. The Court has supplemental jurisdiction over all related state claims pursuant to 28 U.S.C. § 1367.

13. Venue is proper in this District because Defendants do a sizeable portion of their business in this District, and all of the wrongs herein alleged occurred in this District.

14. Venue is proper in this forum pursuant to 28 U.S.C. § 1391, because at all times relevant hereto, Defendants are and always have been responsible for the acts alleged herein, a substantial portion of the practices complained of herein occurred in this District, and Defendants have received substantial compensation as a result of doing business in this District. Moreover, at all times material to the allegations contained herein, conducted substantial business in the state of Ohio.

## FLSA COVERAGE.

15. At all times referenced herein, the BizQualify and BrightQuery were and/or are an enterprise within the meaning of Section 3(r) of the FLSA, 29 U.S.C. § 203(r) and formed a single enterprise engaged in commerce within the meaning of Section 3(s)(1) of the FLSA, 29 U.S.C. § 203(s)(1), in that said enterprise at all times hereinafter mentioned had employees engaged in commerce or in the production of goods for commerce, or employees handling, selling or otherwise working on goods or materials that have been moved in or produced for commerce by any person and in that enterprise had an annual gross volume of sales made or business done of not less than $500,000.00.

16. During all times material to this Complaint, Plehn supervised and/or controlled Harrington's employment with BizQualify and/or BrightQuery and acted directly or indirectly in the interest of BizQualify and BrightQuery in relation to their employees.

17. During all times material to this Complaint, Plehn-Dujowich possessed operational control over Bizqualify and BrightQuery and their day-to-day operations, to include BizQualify and/or BrightQuery's wage practices, and was an employer within the meaning of section 3(d) of the FLSA.

## STATEMENT OF FACTS.

### The Relationship Between BizQualify and Bright Query.

18. In or around 2013, Plehn-Dujowich founded BizQualify to engage in the for-profit accumulation, analysis, and sale of public and private company financial data to consumers. According to information presented on its website, BizQualify "leverages Form 5500 filings with the IRS & Labor Dept. . . . [and] collects regulatory filings and scrapes the websites of 10M+ companies." BizQualify then used the information contained in those materials to conduct "fundamental research" and quantitative analysis. BizQualify sold this information and research to its customers, who then use the information in making investment, sales, and marketing decisions.

19. Sifting through these regulatory documents to extract the financial data and analyze that data in a manner useful to Defendants' business is a labor-intensive exercise, requiring substantial work on the part of the researcher. As a result, Defendants sought out cost-effective methods of acquiring and analyzing as much financial data as possible, while limiting costs.

20. Between 2016 and 2017, BizQualify operated a fraudulent educational program called the Global Financial Data Project, with Plehn-Dujowich acting as the project's Executive Director ("Fake Educational Program").

21. Through the Fake Educational Program, Bizqualify recruited university students interested in business, accounting, and finance to perform the data collection and analysis tasks required for BizQualify's business, without pay. In fact, BizQualify charged these students a "course fee" to perform this work for BizQualify for free.

22. In exchange for payment of the "course fee" and their free labor, BizQualify promised students enrolled in its Fake Educational Program meaningful educational instruction, a course certification from UC Berkeley and/or UCLA, and a letter of recommendation written by Plehn-Dujowich – none of which BizQualify ever provided to the students.

23. In March of 2018, several of the students who had enrolled in BizQualify's Fake Educational Program brought suit against BizQualify and Plehn-Dujowich in the District Court for the Northern District of California for violations of the FLSA, fraud, unjust enrichment, quantum meruit, theft, and other claims under California law. That matter was captioned as *Qiuzi Hu, et al, v. Jose M. Plehn-Dujowich*, et al, Case No. 3:2018cv01791 ("*Hu* Litigation").

24. Initially, BizQualify and Plehn-Dujowich intentionally defaulted in the *Hu* Litigation.

25. Upon information and belief, Plehn-Dujowich changed the name of BizQualify to Bright Query, Inc. due to the reputational harm caused to BizQualify by the *Hu* Litigation.

26. BizQualify began operating under the name Bright Query during 2018.

27. Bright Query and BizQualify are and were both owned and operated by Plehn-Dujowich.

28. Bright Query operates out of the same office(s) that Bizqualify formerly operated out of.

5

29.  Bright Query provides the same services as BizQualify did to the same customers and/or clients.

30.  Bright Query utilizes the same equipment and supplies that were used by BizQualify.

31.  Bright Query was not legally incorporated until December of 2019.

32.  At the time Bright Query was legally formed, it continued to employ the same employees and manager whom had been employed by BizQualify.

33.  Although Bright Query was not legally incorporated until December of 2019, it operated as a single business along with Biz Qualify, and Plehn-Dujowich operated the company under the names Bright Query and Biz Qualify interchangeably.

34.  Bright Query is the successor to Biz Qualify and is liable for its violations of the FLSA, as stated herein.

## Harrington's Employment With Defendants.

35.  Harrington is a former employee of BizQualify and/or Bright Query.

36.  Harrington was hired by Defendants to be the Vice President of Data Analytics on or around May 6, 2019.

37.  The *Hu* Litigation remained pending when Harrington was hired.

38.  At the time Defendants hired Harrington, they presented him with a signed Employment Agreement, a true and accurate copy of which is attached hereto as Exhibit "A" ("Employment Agreement")

39.  The Employment Agreement stated that the offer of employment being made to Harrington was being made "on behalf of BizQualify soon to be known as Bright Query, Inc" and defined both companies as "the 'Company' or BQ."

40. The Employment Agreement stated that Harrington would receive a base salary of $75,000.00 per year; a "joining bonus" of $5,000.00; and an incentive stock option for "25,000 options which will vest according to the Company's Stock Plan."

41. The Employment Agreement was signed by Bruce Fador, who identified himself as "CEO, BizQualify/ Bright Query, Inc."

42. BizQualify is a party to the Employment Agreement.

43. Bright Query is a party to the Employment Agreement.

44. Defendants provided Harrington with a document titled "Job Responsibilities," a true and accurate copy of which is attached hereto as "Exhibit B" (Job Responsibilities List").

45. The Job Responsibilities List explicitly stated that Harrington had responsibilities to "BQ," whom Defendants earlier identified in the Employment Agreement as comprising of both BizQualify and Bright Query:

**Job Responsibilities**

The **VP of Analytics** will perform the following duties:

- Write case studies, research reports, and blog articles for marketing purposes to explain how BQ data can be used in verticals such as prospecting, commercial credit, and capital markets.
- Assist clients in meetings with understanding how to leverage BQ data for their purposes.
- Write queries and work with BQ engineers to perform data extracts for clients.
- Develop new datasets and analytical models leveraging U.S. government filings.
- Test existing datasets and analytical models for accuracy.
- Assist with data validation process in monthly data generation routines.

46. At all times referenced herein, Harrington was jointly employed by BizQualify and Bright Query.

47. During his employment with Defendants, Harrington was in regular contact with Plehn-Dujowich and Fador.

48. Harrington regularly worked between 35 and 45 hours per week.

7

49.  Harrington was not paid any wages at all between his hire date and August 6, 2019.

50.  Harrington complained to Plehn-Dujowich about not being paid.

51.  On or about July 26, 2019, Plehn-Dujowich provided Harrington with a letter apologizing

for BizQualify's failure to pay him:



BizQualify™

July 26, 2019

Kirk Harrington
7521 Battery Park Blvd.
Cleveland, Ohio 44102

Dear Kirk:

We would like to apologize that we have not yet been able to start your compensation, even though you have been working for BizQualify since May 15, 2019. BizQualify has not yet been able to receive the funding needed to start compensating any of its employees. We hope the funding will arrive very soon so that we can all initiate our compensation. We apologize for any convenience this may have caused.

Sincerely,

Jose M. Plehn-Dujowich
CEO
BizQualify LLC
2901 West Coast Highway
Suite 200
Newport Beach, CA 92633

52. Harrington complained to Fador, Plehn-Dujowich and Bizqualify's Chief Revenue Officer, Tim Walker, about not getting paid.

53. Fador and Walker responded to Harrington's complaints about not being paid by telling Harrington that they had not gotten paid either and were going to leave the company.

54. On July 31, 2019, Walker sent Harrington the following text complaining of "zero pay" since December of 2018 and stating that he was going to stop working for Defendants "until we get a new path forward":



> Tim Walker  (+1 (617) 281-6889)
>
> Hi Kirk ..no need to discuss yet  .  I have everything on hold with the prospects at the moment  .  If we are able to move forward in a new business model I will re-engage each of these trial accounts  .  At that time we can discuss the file for AllianceBernstein ..  I have worked each day since December for Jose with zero pay and false promises ..I am suspending any work for BQ at this time until we get a new path forward  .  I know Bruce explained this to you  .  Hopefully we can get some answers this week on a path forward that works for all of us  .  Fingers crossed  .
>
> 12:42:59 PM

55. On August 6, 2019, Fador sent Harrington a text in which he complained "I am 9 + months with zero here. It's embarrassing."

56. Subsequently, Fador left his employment with Defendants.

57. Harrington again tried to reach Plehn-Dujowich and threaten to "sue" if he did not get paid.

58. In response, Plehn-Dujowich proposed to start paying Harrington on an hourly basis, beginning on August 7, 2019 "("Oral Promise").

59. Defendants promised Harrington $36.00 per hour.

60. Hoping he would finally get paid, Harrington agreed to work for Defendants on an hourly basis.

61. Harrington continued to work for Defendants after agreeing to be paid hourly, although he began to work less that 40 hours per week.

62. Subsequently, Harrington began submitting his weekly hours to Plehn-Dujowich.

63. Defendants continued to fail to pay Harrington.

64. Harrington continued to complain about not being paid by Defendants.

65. Each time Harrington would complaint, Plehn-Dujowich would promise Harrington that there would be funding "soon" and that Harrington would get paid.

66. Plehn-Dujowich would lie to Harrington in order to keep him working for free by continually making excuses and claiming that he was in talks with "investors."

67. Upon information and belief, Plehn-Dujowich also lied to Walker to keep him working for free.

68. For example, in October of 2019, Plehn-Dujowich announced that Walker was being promoted to the position of CEO.

69. On or about October 24, 2019, Walker sent Harrington a text message in which he stated that Plehn-Dujowich had hired new people that he would likely not pay because "he's doing the only thing he knows…find new people to get free work from."

70. Harrington continued to work for Defendants until mid-November, 2019, when Plehn-Dujowich stopped communicating with Harrington.

## COUNT I: FAILURE TO PAY MINIMUM WAGE IN VIOLATION OF THE FLSA, 29 U.S.C. § 207.

71. Harrington restates each and every prior paragraph of this Complaint, as if it were fully restated herein and further alleges as follows:

72. Section 6 of the FLSA, 29 U.S.C. § 206, establishes the right to be paid minimum wages.

73. At all times relevant to this action, Defendants willfully failed and refused to pay Harrington anything for the work he performed for Defendants.

74. Harrington was not exempt from the right to receive minimum wages under the FLSA during his employment with Defendants.

75. Harrington is entitled to be paid at least the minimum wage for all hours he worked under 40 in a given week.

76. As a result of Defendants' failure to pay Harrington at all for work he performed for Defendants, Defendants violated the FLSA, 29 U.S.C. §§ 201 et. seq., including 29 U.S.C. § 207(a)(1) and § 215(a).

77. Defendants' failure and refusal to pay Harrington wages was willful, intentional, and not in good faith.

78. Harrington is entitled to all legal and equitable remedies available for violations of the FLSA, including, but not limited to, back pay, liquidated damages, pre-judgment and post-judgment interest, reasonable attorneys' fees and litigation costs, and other compensation pursuant to the FLSA.

## COUNT II: FAILURE TO PAY OVERTIME IN VIOLATION OF THE FLSA, 29 U.S.C. § 206.

79. Harrington restates each and every prior paragraph of this Complaint, as if it were fully restated herein and further alleges as follows:

80. The FLSA requires each covered employer such as Defendants to compensate all non-exempt employees at a rate of not less than 1.5 times the regular rate of pay for work performed in excess of 40 hours in a work week.

81. Harrington was not exempt from the right to receive overtime pay under the FLSA during his employment with Defendants.

82. Harrington is entitled to be paid overtime compensation for all overtime hours worked.

83. At all times relevant to this Complaint, Defendants had a policy and practice of failing and refusing to pay their employees anything, including overtime pay.

84. As a result of Defendants' failure to properly compensate Harrington overtime for all work performed in excess of 40 hours in a work week, Defendants violated the FLSA, 29 U.S.C. §§ 201 et. seq., including 29 U.S.C. § 207(a)(1) and § 215(a).

85. Defendants' failure and refusal to pay Harrington overtime wages for all overtime hours Harrington worked was willful, intentional, and not in good faith.

86. Harrington is entitled to all legal and equitable remedies available for violations of the FLSA, including, but not limited to, back pay, liquidated damages, pre-judgment and post-judgment interest, reasonable attorneys' fees and litigation costs, and other compensation pursuant to the FLSA.

## COUNT III: VIOLATION OF THE OHIO MINIMUM FAIR WAGE STANDARDS ACT, O.R.C. § 4111.03, *et seq*, BASED ON FAILURE TO PAY OVERTIME.

87. Harrington restates each and every prior paragraph of this Complaint, as if it were fully restated herein and further alleges as follows:

88. At all relevant times, Defendants have been, and continue to be, an "employer" within the meaning of the OMFWSA.

89. At all relevant times, Defendants have employed and continue to employ, "employees," within the meaning the OMFWSA.

90. Harrington was an employee of Defendants as that term is defined by the OMFWSA.

91. Ohio R.C. § 4111.03 provides that "[a]n employer shall pay an employee for overtime at a wage rate of one and one-half times the employee's wage rate for hours worked in excess of forty hours in one workweek, in the manner and methods provided in and subject to the exemptions of section 7 and section 13 of the [FLSA]…"

92. Defendants failed to pay Harrington overtime for hours she worked in excess of 40 per week.

93. In denying Harrington overtime compensation, Defendants violated the OMFWSA and Article II, Section 34a of the Ohio Constitution.

94. As a direct and proximate result of Defendants' unlawful conduct, Harrington has suffered and will continue to suffer a loss of income and other damages.

95. Having violated the OMFWSA, Defendants are joint and severally liable to Harrington pursuant to O.R.C. § 4111.10 for the full amount of his unpaid overtime and for costs and reasonable attorneys' fees.

**COUNT IV: VIOLATION OF THE OHIO MINIMUM FAIR WAGE STANDARDS ACT, O.R.C. § 4111.03, *et seq*, BASED ON FAILURE TO PAY MINIMUM WAGE.**

96. Harrington restates each and every prior paragraph of this Complaint, as if it were fully restated herein and further alleges as follows:

97. At all relevant times, Defendants have been, and continue to be, an "employer" within the meaning of the OMFWSA.

98. At all relevant times, Defendants have employed and continue to employ, "employees," within the meaning the OMFWSA.

99. Harrington was an employee of Defendants as that term is defined by the OMFWSA.

100. The OMFWSA requires that covered employees be compensated for every hour worked in a workweek. See O.R.C. §§ 4111.01, et seq.

101. Defendant violated the OMFWSA with respect to Harrington by, *inter alia*, failing to pay Harrington the applicable minimum wage.

102. Having violated the OMFWSA, Defendants are joint and severally liable to Harrington pursuant to O.R.C. § 4111.10 for the full amount of his unpaid minimum wages, an equal amount in liquidated damages, and for costs and reasonable attorneys' fees.

**COUNT V:  VIOLATION OF THE OHIO PROMPT PAYMENT ACT, O.R.C. § 4113.51.
(Asserted Against Defendant BizQualify and Bright Query Only).**

103. Harrington restates each and every prior paragraph of this Complaint, as if it were fully restated herein.

104. The Ohio Prompt Pay Act ("OPPA") required BizQualify to pay Harrington all wages, including unpaid overtime, on or before the first day of each month, for wages earned by Harrington during the first half of the preceding month ending with the fifteenth day thereof, and on or before the fifteenth day of each month, for wages earned by Harrington during the last half of the preceding calendar month. *See* O.R.C. § 4113.15(A).

105. Harrington was not paid all wages due within 30 days of her performing the work that entitled him to wages. *See* R.C. §4113.15(B).

106. Harrington unpaid wages remain unpaid for more than 30 days beyond his regularly scheduled payday.

107. Harrington has been harmed and continues to be harmed by BizQualify's acts and/or omissions as described herein and is entitled to the greater of $200.00 or an additional six percent on the total amount of wages due. See O.R.C. § 4113.15(C).

**COUNT VI: BREACH OF CONTRACT.**

108. Harrington restates each and every prior paragraph of this Complaint, as if it were fully restated herein.

14

109. By their actions and pursuant to the Employment Agreement and Oral Agreement, Defendants entered into a contract of employment with Harrington whereby Harrington performed compensable work for Defendants in exchange for Defendants promise to pay Harrington a salary, bonus, stock options, and to provide Harrington with health benefits.

110. Harrington satisfied all obligations pursuant to the contract, actual and implied, by performing work for Defendants.

111. Defendants breached the contract by failing to provide Harrington with any of the compensation or benefits they promised to provide him.

112. Harrington has suffered damages as a result of Defendants' wrongful conduct.

## COUNT VII: UNJUST ENRICHMENT.

113. Harrington restates each and every prior paragraph of this Complaint, as if it were fully restated herein.

114. From May 6, 2019 until November of 2019, Harrington performed work and provided services for Defendants.

115. Defendants acknowledged, accepted and benefited from the value provided by Harrington.

116. Pursuant to the Employment Agreement, Harrington expected to be paid a base salary of $75,000.00 per year, along with a $5,000.00 bonus, and to receive health insurance benefits.

117. Subsequent to August 6, 2019, and based on Plehn-Dujowich's oral promises, Harrington expected to be paid an hourly rate of $36.00 per hour, along with the still unpaid $5,000.00 bonus, and to receive health insurance benefits.

118. Defendants failed to pay Harrington his salary, his hourly pay, or any compensation at all.

15

119. It would be inequitable for the Defendants to enjoy the benefit of the value provided by Harrington without compensating him as agreed under the Employment Agreement and subsequent Oral Agreement.

## COUNT VIII: PROMISSORY ESTOPPEL.

120. Harrington restates each and every prior paragraph of this Complaint, as if it were fully restated herein.

121. Defendants made clear and unambiguous promises to Harrington that he would receive compensation and other benefits if he continued to work for Defendants for free.

122. Harrington justifiably relied to his detriment upon Defendants' promises by continuing to work without pay and by foregoing other employment.

123. Defendants intended that Harrington rely upon said promises in an effort to compel Harrington to provide services to Defendants.

124. Harrington sustained damages as a direct and proximate result of Defendants' broken promises and Harrington's justifiable reliance thereon.

## COUNT IX: FRAUD.

125. Harrington restates each and every prior paragraph of this Complaint, as if it were fully restated herein.

126. On May 6 2019, Defendants represented and promised to Harrington that he would receive compensation and other benefits in exchange for his work; specifically, that Harrington would be employed by Defendants and receive a salary, bonus, stock options, and other benefits in exchange for his work.

127. Defendants' offer to employ and compensate Harrington was a deliberate scam, designed to obtain free labor, that Defendants have perpetrated in one form or another for years against countless victims, to include the *Hu* litigation plaintiffs, Harrington, Walker, and Fador.

128. When Harrington began to question why he was not being paid for his work, Plehn-Dujowich took additional steps to convince Harrington that he, BizQualify, and/or Bright Query would compensate Harrington as agreed in the Employment Agreement and Oral Agreement when they got "funding" from an "investor."

129. Defendants continually provided Harrington with false information so that he would be incentivized to continue working for Defendants without pay.

130. Defendants' representations to Harrington were false, and Defendants knew or should have known that those representations were false.

131. Defendants had no intention of paying Harrington anything when they hired him, but fraudulently represented otherwise to Harrington.

132. There were no "stocks" of BizQualify or Bright Query to pay Harrington; Defendants just made up the existence of stocks and offered to pay Harrington these fake "stock options" in order to make BizQualify and/or Bright Query appear to be sophisticated and to create a more enticing offer for Harrington to work for free.

133. Defendants had no intention of providing Harrington with health insurance benefits, but nonetheless fraudulently told Harrington he would receive such benefits in order to obtain free labor from him.

134. Defendants intentionally and knowingly deceived Harrington, with actual malice, in that Defendants never intended to pay Harrington anything for his work.

135. The representations made by Defendants were as to existing material facts, upon which Defendants intended Harrington to rely.

136. Harrington justifiably relied on Defendants' representations.

137. At all times referenced herein, Plehn-Dujowich was acting on behalf of BizQualify and Bright Query when he defrauded Harrington.

138. Harrington sustained damages as a direct and proximate result of Plehn-Dujowich 's fraudulent conduct.

## COUNT X: QUANTUM MERUIT.

139. Harrington restates each and every prior paragraph of this Complaint, as if it were fully restated herein.

140. As a result of Defendants requests, representations, and instructions, Harrington performed work for Defendants.

141. There was never any understanding between Harrington and Defendants that the services rendered by Harrington were gratuitous. Rather, Harrington performed these services, to the sole benefit of Defendants' business operations, in exchange for compensation and benefits that were never provided to him.

142. Accordingly, Harrington is entitled to recover the reasonable value of such services rendered on behalf of, and for, Defendants.

## COUNT XI: ALTER EGO.

143. Harrington restates each and every prior paragraph of this Complaint, as if they were fully restated herein.

144. BizQualify and Bright Query are the alter egos of Plehn-Dujowich.

145. Plehn-Dujowich exercises complete dominion and control over BizQualify and Bright Query, such that said entities have no separate mind, will or existence.

146. Upon information and belief, BizQualify and Bright Query do not observe corporate formalities.

147. Plehn-Dujowich used BizQualify and Bright Query to perpetuate the above-described fraud against Harrington.

148. Upon information and belief, Plehn-Dujowich has diverted funds from BizQualify and Bright Query for his personal use.

149. BizQualify and Bright Query were undercapitalized at the time Plehn-Dujowich incurred debts on its behalf, including but not limited to promising wages to Harrington.

150. BizQualify and Bright Query are mere facades for the operations of the dominant and only shareholder, Plehn-Dujowich.

151. Plehn-Dujowich is liable for the obligations of BizQualify and Bright Query.

152. Pursuant to R.C. § 2721.02, Harrington is entitled to a declaration that BizQualify and Bright Query are the alter egos of Plehn-Dujowich, and to collect the any judgment rendered in this matter against them against Plehn-Dujowich personally.

**COUNT XII: ACTION TO PIERCE THE CORPORATE VEIL.**

153. Harrington restates each and every prior paragraph of this Complaint, as if it were fully restated herein.

154. Plehn-Dujowich 's control over BizQualify and Bright Query is so complete that they no separate mind, will, or existence of their own.

155. Plehn-Dujowich exercised his control over BizQualify and Bright Query in such a manner as to commit fraud against Harrington.

156. As a result of Plehn-Dujowich 's abuse of the corporate form, Harrington has suffered damages.

## **PRAYER FOR RELIEF .**

WHEREFORE, as a result of the unlawful conduct of Defendants, Harrington respectfully requests that this Court enter judgment in his favor and against Defendants and grant the maximum relief allowed by law, including, but not limited to:

a. Issuing a declaratory judgment that the practices complained of herein are unlawful under the FLSA, 29 U.S.C. §§ 201 *et seq.*.;

b. Issuing a declaratory judgment that BizQualify and Bright Query are the alter egos of Plehn-Dujowich, and that Harrington may collect any damages he recovers against BizQualify and Bright Query against Plehn-Dujowich directly;

c. Awarding Harrington unpaid minimum wages, unpaid overtime wages, and an additional equal amount as liquidated damages pursuant to 29 U.S.C. § 216(b);

d. Awarding damages, including actual, general, special, incidental, statutory, punitive, treble, liquidated, and consequential to Harrington in an amount to be determined at trial;

e. Awarding pre-judgment and post-judgment interest as provided by law;

f. Awarding reasonable attorneys' fees and costs; and

g. Awarding such other and further relief that this Court deems appropriate.

Respectfully submitted,

*/s/Chris P. Wido*
Chris P. Wido (0090441)
**THE SPITZ LAW FIRM, LLC**
25200 Chagrin Boulevard, Suite 200
Beachwood, OH 44122
Phone: (216) 291-4744
Fax:   (216) 291-5744
Email: Chris.Wido@spitzlawfirm.com

*Attorney For Plaintiff Kirk Harrington*

## JURY DEMAND

Plaintiff Kirk Harrington demands a trial by jury by the maximum number of jurors permitted.

/s/Chris P. Wido
Chris P. Wido (0090441)

*Attorney for Plaintiff Kirk Harrington*