IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| **KIRK HARRINGTON,** | CASE NO. 1:21-CV-00960-PAB |
| **Plaintiff,** | |
| -vs- | JUDGE PAMELA A. BARKER |
| **JOSE M. PLEHN-DUJOWICH, et al.,** | |
| | MEMORANDUM OPINION AND |
| **Defendants.** | ORDER |

This matter comes before the Court upon the Motion for Default Judgment filed by Plaintiff Kirk Harrington ("Plaintiff" or "Harrington") on October 26, 2021, seeking default judgment against Defendants Jose M. Plehn-Dujowich, a.k.a. Jose M. Plehn ("Plehn") and Bright Query, Inc. ("Bright Query") (collectively, "Defendants") under Rule 55(b) (the "Motion") (Doc. No. 19.) For the following reasons, Plaintiff's Motion is GRANTED IN PART AND DENIED IN PART.

I.  **Factual Background and Procedural History**

On May 8, 2021, Harrington filed a Complaint against Defendants Plehn, Bright Query, and BizQualify, LLC ("BizQualify"),[1] setting forth claims related to breach of contract and unpaid wages under the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201, *et seq.*, and the Ohio Minimum Fair Wage Standards Act, R.C. § 4111.01, *et seq.* (Doc. No. 1.) Therein, Harrington asserts twelve (12)

---

[1] Plaintiff avers that BizQualify began operating under the name Bright Query during 2018 and that "Bright Query and Biz Qualify are and were both owned and operated by Plehn" and that "Bright Query operates out of the same office(s) that Biz[Q]ualify formerly operated out of" and "provides the same services as BizQualify did to the same customers and/or clients." (Doc. No. 1 at ¶¶ 26-30.) Although Bright Query was not legally incorporated until December 2019, "it operated as a single business along with Biz Qualify, and [Plehn] operated the company under the names Bright Query and Biz Qualify interchangeably." (*Id.* at ¶ 33.) Bright Query is the successor to BizQualify and is liable for its violations of the FLSA. (*Id.* at ¶¶ 31-34.) The Court will therefore construe references to Biz Qualify in the Complaint as including Bright Query.

claims for relief: (1) Count I: Failure to Pay Minimum Wage in Violation of the FLSA, 29 U.S.C. § 207; (2) Count II: Failure to Pay Overtime in Violation of the FLSA, 29 U.S.C. § 206; (3) Count III: Violation of the OMFWSA Based on Failure to Pay Overtime; (4) Count IV: Violation of the OMFWSA Based on Failure to Pay Minimum Wage; (5) Count V: Violation of the Ohio Prompt Payment Act, R.C. § 4113.15 (asserted against Defendants BizQualify and Bright Query only); (6) Count VI: Breach of Contract; (7) Count VII: Unjust Enrichment; (8) Count VIII: Promissory Estoppel; (9) Count IX: Fraud; (10) Count X: Quantum Meruit; (11) Count XI: Alter Ego; and (12) Count XII: Action to Pierce the Corporate Veil. (*Id.* at ¶¶ 71-156.)

Around 2013, Plehn founded BizQualify/Bright Query to engage in the for-profit "accumulation, analysis, and sale of public and private company financial data to consumers." (*Id.* at ¶ 18.) Bright Query leverages information from corporate regulatory filings and company websites to conduct research and quantitative analysis, which it sells to customers who then use this information in making investment, sales, and marketing decisions. (*Id.*)[2] Harrington is a former employee of Bright Query, who was hired by Defendants to be the Vice President of Data Analytics around May 6, 2019. (*Id.* at ¶¶ 35-36.) At the time that Defendants hired Harrington, they presented him with a signed Employment Agreement (the "Employment Agreement"), which provided that the offer of employment was being made "on behalf of BizQualify soon to be known as Bright Query, Inc." (*Id.* at ¶ 39; Doc. No. 19-1 at PageID# 123.) The Employment Agreement also sets forth that

---

[2] Harrington also avers that between 2016 and 2017, Defendants operated a fraudulent educational program called the Global Financial Data Project ("GFDP"), whereby Defendants recruited university students to perform data collection and analysis without pay and charging the students a "course fee" to perform the work. In exchange for the course fee and labor, Defendants promised the students a course certification. (Doc. No. 1 at ¶¶ 20-22.) In March 2018, several students who had enrolled in this program brought suit against Defendants in the Northern District of California "for violations of the FLSA, fraud, unjust enrichment, quantum meruit, theft, and other claims under California law," with the case being resolved by an order approving a settlement. (*Id.* at ¶ 23; *see also Hu, et al. v. Jose M. Plehn-Dujowich, et al.*, No. 3:18-cv-01791, 2020 WL 12443171 (N.D. Cal. Mar. 2, 2020).)

Harrington would receive a base salary of $75,000.00 per year, a "starting bonus" of $5,000.00, and an incentive stock option for "25,000 options which will vest according to the Company's Stock Plan." (*Id.* at ¶ 40; Doc. No. 19-1 at PageID# 123.) The Employment Agreement was signed by both Bruce Fador ("Fador"), as "CEO[,] BizQualify/Bright Query[,] Inc." and by Harrington. (*Id.* at ¶¶ 41-43; Doc. No. 19-1 at PageID# 126.) Defendants provided Harrington with a document titled "Job Responsibilities," which included, among other things, writing case studies, research reports, and blog articles for marketing purposes, assisting clients in meetings, and developing new datasets and analytical models. (*Id.* at ¶¶ 44-45.) During his employment with Defendants, Harrington was in regular contact with Plehn and Fador and consistently worked between 35 and 45 hours per week. (*Id.* at ¶¶ 47-48.)

However, Harrington was not paid any wages at all between his starting date of May 15, 2019 and August 6, 2019, and Harrington complained to Plehn about the lack of compensation. (*Id.* at ¶¶ 49-50.) On July 26, 2019, Plehn provided Harrington with a letter apologizing for BizQualify/Bright Query's inability to pay him. (*Id.* at ¶ 51.) Therein, Plehn expressed his apologies to Harrington that "we have not yet been able to start your compensation, even though you have been working for BizQualify since May 15, 2019," and indicated that this was due to the company having not yet secured funding. (*Id.*) Harrington also complained to Fador and the company's Chief Revenue Officer, Tim Walker ("Walker") about not getting paid. (*Id.* at ¶ 52.) Fador and Walker responded to Harrington's complaints by indicating that they also had not received compensation and were going to leave the company. (*Id.* at ¶¶ 53-56.) Harrington again tried to reach Plehn and threatened to sue if he did not get paid. (*Id.* at ¶ 57.) In response, Plehn proposed to start paying Harrington on an hourly

basis at the rate of $36.00 per hour, beginning on August 7, 2019, to which Harrington agreed. (the "Oral Promise"). (*Id.* at ¶¶ 58-60.)

Harrington continued to work for Defendants after agreeing to be paid hourly, but began to work less than 40 hours per week and submitted his weekly hours to Plehn. (*Id.* at ¶¶ 60-62.) Plehn continued to fail to pay Harrington, who again complained about the lack of compensation. (*Id.* at ¶¶ 63-64.) Harrington alleges that each time he would complain, Plehn would promise that there would soon be funding and that Harrington would be paid. Harrington also alleges that Plehn "would lie to Harrington in order to keep him working for free by continually making excuses and claiming that he was in talks with 'investors.'" (*Id.* at ¶¶ 65-66.) Harrington avers that Plehn also lied to Walker to keep him working for free and that on October 24, 2019, Walker texted Harrington that Plehn had hired new people that likely would not be paid because "[Plehn's] doing the only thing he knows . . . find new people to get free work from." (*Id.* at ¶¶ 67-69.) Harrington continued to work for Defendants until November 14, 2019, when Plehn stopped communicating with him. (*Id.* at ¶ 70.) Thus, Harrington worked for Defendants for six months.

The docket reflects that Bright Query was served by certified mail on May 24, 2021 (Doc. No. 7) and that Plehn was served via FedEx on August 27, 2021. (Doc. Nos. 18, 18-1.) Harrington filed an Application for Entry of Default under Fed. R. Civ. P. 55(a) against Bright Query on July 14, 2021, and the Clerk entered default against Bright Query that same day. (Doc. Nos. 11, 12.) The Court later acknowledged that Harrington had not yet applied for an entry of default against Plehn and prompted Harrington to make an appropriate application. (Non-Document Order of Feb. 4, 2022.) Harrington requested an entry of default against Plehn on February 7, 2022, which was entered by the Clerk that day. (Doc. Nos. 20, 21.)

On October 26, 2021, Plaintiff filed the instant Motion. (Doc. No. 19.) As Defendants are in default and have thus far failed to respond to the lawsuit, there has been no Opposition filed thereto. Accordingly, the Motion is ripe for a decision.

**II.     Standard of Review**

Following the clerk's entry of default pursuant to Rule 55(a) and the party's motion for default judgment under Rule 55(b), "the complaint's factual allegations regarding liability are taken as true, while allegations regarding the amount of damages must be proven." *P&G Health & Longterm Disability Plan v. Molinary*, No. 1:18-cv-283, 2019 WL 358936, at *1 (S.D. Ohio Jan. 29, 2019) (quoting *Morisaki v. Davenport, Allen & Malone, Inc.*, No. 2:09-cv-298, 2010 WL 3341566, at *1 (E.D. Cal. Aug. 23, 2010)). Specifically, this Court is required to "conduct an inquiry in order to ascertain the amount of damages with reasonable certainty." *Osbeck v. Golfside Auto Sales, Inc.*, No. 07-14004, 2010 WL 2572713, at *4 (E.D. Mich. June 23, 2010). To do so, the civil rules "require that the party moving for a default judgment must present some evidence of its damages." *Mill's Pride, L.P. v. W.D. Miller Enterprises, LLC*, No. 2:07-cv-990, 2010 WL 987167, at *1 (S.D. Ohio Mar. 12, 2010).

Rule 55(b)(2) "allows but does not require the district court to conduct an evidentiary hearing" regarding damages. *Vesligaj v. Peterson*, 331 F. App'x 351, 354-55 (6th Cir. 2009). An evidentiary hearing is not required if the Court can determine the amount of damages by computation from the record before it. *HICA Educ. Loan Corp. v. Jones*, No. 4:12 CV 962, 2012 WL 3579690, at *1 (N.D. Ohio Aug. 16, 2012). The Court may rely on affidavits submitted on the issue of damages. *Schilling v. Interim Healthcare of Upper Ohio Valley, Inc.*, No. CIV A 206-CV-487, 2007 WL 152130, at *2

(S.D. Ohio Jan. 16, 2007); *see also P&G Health & Longterm Disability Plan*, 2019 WL 358936, at *1.

### III. Analysis

Upon review of the record in this case, the Court finds that default judgment is warranted. Defendants' failure to respond to the Complaint, entry of default, or Motion for Default Judgment has made it clear that Defendants have no intention of defending this action. The Court accepts the allegations set forth in the Complaint as true and, therefore, finds that Defendants are liable.

#### A. Joint and Several Liability

First, the Court finds that Defendants are jointly and severally liable to Harrington. As it pertains to Harrington's claims under the FLSA and OMFWSA, "The Sixth Circuit uses the 'economic reality' test to determine 'whether a person is an employer responsible for FLSA obligations.'" *Becker v. Sam Gildersleeve & Son Plumbing, Inc.*, No. 1:20-cv-2359, 2021 WL 4348260, at *1 (N.D. Ohio Sept. 24, 2021) (quoting *U.S. Dep't of Labor v. Cole Enterprises, Inc.*, 62 F.3d 775, 778 (6th Cir. 1995)). Under this test, "a corporate officer who has operational control of the corporation's covered enterprise is an employer under FLSA, along with the corporation itself." *Id.* (quoting *Cole Enterprises*, 62 F.3d at 778). Harrington alleges that during his employment with Defendants, he was in regular contact with Plehn and would get weekly work assignments from Plehn. (Doc. No. 1 at ¶ 47; Doc. No. 19-1 (Decl. of Kirk Harrington) at PageID# 120, ¶¶ 45-46.) Harrington avers in his Declaration that he "was directly supervised by Plehn during [his] employment, and [] interacted with him on a near daily-basis until November 17, 2019, when he stopped communicating." (Doc. No. 19-1 at PageID# 118, ¶ 15.) Harrington complained to Plehn on numerous occasions about the lack of pay. (Doc. No. 1 at ¶¶ 50, 57; Doc. No. 19-1 at PageID#s 120-

22, ¶¶ 54-56, 58-61.) Harrington also points to the fact that the Bright Query website identifies Plehn as the "CEO, Chief Data Officer, and Founder of Bright Query." (Doc. No. 19-2 at PageID# 128; Doc. No. 19 at PageID# 110.)

The Court finds that Defendants are both liable under the FLSA. For example, "[o]ne who is the chief executive officer of a corporation, has a significant ownership interest in it, controls significant functions of the business, and determines salaries and makes hiring decisions has operational control and qualifies as an 'employer' for the purposes of FLSA." *Cole Enterprises*, 62 F.3d at 778. Moreover, Defendants are jointly liable under the OMFWSA. *See, e.g.*, *Stargel v. Lewaro Constr., Inc.*, No. 3:16-cv-47, 2017 WL 3600431, at *3 (S.D. Ohio Aug. 17, 2017) ("There is no significant difference between how 'employer' . . . [is] defined under the OMFWSA vis-a-vis the FLSA . . . and FLSA and OMFWSA claims are analyzed 'in a unitary fashion.'" (citing *Douglas v. Argo-Tech. Corp.*, 113 F.3d 67, 69 n.2 (6th Cir. 1997)).

In addition to the joint and several liability under the FLSA and OMFWSA claims, Harrington asserts claims of Alter Ego (Count XI) and Action to Pierce the Corporate Veil (Count XII). (Doc. No. 1 at ¶¶ 143-56.) These claims go hand-in-hand as Harrington argues that, "Plehn is the alter ego of Bright Query and should be found joint and severally liable on any judgment in Harrington's favor." (Doc. No. 19 at PageID# 110.) Harrington argues that because Bright Query is a Delaware corporation, Delaware law applies to the analysis of the alter ego and veil piercing claims. (*Id.* at PageID# 111.) Pursuant to Ohio Revised Code § 1705.53, "the laws of the state under which a foreign limited liability company is organized govern its organization and internal affairs and the liability of its members." Bright Query is organized as a Delaware corporation, as evidenced by the corporate registration filings Harrington appended to his application for entry of default against Bright Query.

(*See* Doc. No. 11-2 at PageID#s 73-76.) Accordingly, Delaware law applies to a determination of whether to disregard Bright Query's corporate form and also hold Plehn liable. "The terms 'alter ego theory' and 'piercing the corporate veil' are used interchangeably in Delaware law." *Winner Acceptance Corp. v. Return on Capital Corp.*, No. 3088-VCP, 2008 WL 5352063, at *5 n.32 (Del. Ch. Dec. 23, 2008).

"Delaware courts have held that, in the interest of justice, when such matters as fraud, contravention of law or contract, public wrong, or where equitable considerations among members of a corporation demand it, the corporate veil may be pierced." *Hitachi Med. Sys. Am., Inc. v. Branch*, No. 5:09-CV-01575, 2010 WL 816344, at *6 (N.D. Ohio Mar. 4, 2010) (citing *Pauley Petroleum, Inc. v. Continental Oil Co.*, 43 Del. Ch. 366, 231 A.2d 450 (1967)). "It should be noted at the outset that persuading a Delaware Court to disregard the [corporate] entity is a difficult task." *DG BF, LLC v. Ray*, No. 2020-0459-MTZ, 2021 WL 776742, at *26 (Del. Ch. Mar. 1, 2021). "Doing so under an alter ego theory 'requires that the corporate structure cause fraud or similar injustice.'" *Id.* (citation omitted). "Effectively, the corporation must be a sham and exist for no other purpose than as a vehicle for fraud." *Id.* At the pleading stage,

> [Plaintiffs] must allege facts that, if taken as true, demonstrate the Officers' and/or the Parents' complete domination and control of the [company]. The degree of control required to pierce the veil is "exclusive domination and control to the point that the [company] no longer has legal or independent significance of its own."

*Id.* at *26-27 (quoting *Wallace ex rel. Cencom Cable Income Partners II, Inc., L.P. v. Wood*, 752 A.2d 1175, 1184 (Del. Ch. 1999)). "Specific facts a court may consider when being asked to disregard the corporate form include: '(1) whether the company was adequately capitalized for the undertaking; (2) whether the company was solvent; (3) whether corporate formalities were observed; (4) whether the dominant shareholder siphoned company funds; and (5) whether, in general, the company simply

8

functioned as a facade for the dominant shareholder.'" *Doberstein v. G-P Indus., Inc.*, No. CV 9995-VCP, 2015 WL 6606484, at *4 (Del. Ch. Oct. 30, 2015) (citation omitted). "The decision to disregard the corporate entity generally results not from a single factor, but rather some combination of them, and an overall element of injustice or unfairness must always be present, as well." *Id.* (internal quotation marks omitted).

The Court finds that under the alter ego theory, Bright Query's corporate veil may be pierced and Plehn may be held liable for the obligations of Bright Query. Here, "BizQualify and Bright Query are the alter egos of [Plehn]." (Doc. No. 1 at ¶ 144.) Plehn exercises complete dominion and control over Bright Query, such that the entity has no separate mind, will, or existence, and upon Harrington's information and belief, Bright Query does not observe corporate formalities. (*Id.* at ¶¶ 145-46, 154.) Plehn used the businesses to perpetuate a fraud against Harrington and upon Harrington's information and belief, Plehn has diverted funds from the businesses for his personal use. (*Id.* at ¶¶ 147-48, 155.) Moreover, Bright Query was "undercapitalized at the time [Plehn] incurred debts on its behalf, including but not limited to promising wages to Harrington." (*Id.* at ¶¶ 149, 51.) Bright Query was a mere façade for the operations of Plehn, the dominant and only shareholder. (*Id.* at ¶ 150.)

Having established joint and several liability under the relevant wage and hour statutes and under applicable corporate law, the Court will proceed with addressing Defendants' liability for additional claims Harrington sets forth in his Complaint.

**B.     Breach of Contract and Promissory Estoppel**

In Count VI, Harrington alleges that Defendants breached the Employment Agreement and in Count VIII asserts a Promissory Estoppel claim. (Doc. No. 1 at ¶¶ 108-12, 120-24.)[3] "To succeed on a claim for breach of contract under Ohio law, an employee 'must show: (1) the existence of a binding contract,' (2) performance of the contract by the employee, (3) breach of the contract by the employer, and (4) damage to the employee caused by the employer's breach." *Godfrey v. Mastec, Inc.*, No. 1:15-cv-409, 2015 WL 7570209, at *4 (S.D. Ohio Nov. 25, 2015). "In the absence of a specified duration of time for employment, the employment relationship continues to be considered 'at-will.'" *Id.* (citing *Goddard v. Abbott Labs.*, No. 2:03-CV-525, 2005 WL 1388389, at *4 (S.D. Ohio June 10, 2005)). "However, 'at will' is only a description of the parties' *prima facie* employment relationship. . . . That description intimates nothing about subsidiary contractual arrangements an employer may make by adding new terms and conditions to the relationship. If an employer makes a subsidiary contractual arrangement, the employer may be legally obligated to comply with it." *Finsterwald-Maiden v. AAA S. Cent. Ohio*, 685 N.E.2d 786, 789 (Ohio Ct. App. 1996). Moreover, "[i]n asserting a claim of promissory estoppel, the plaintiff 'must show that the employer has made a promise clear and unambiguous in its terms to the employee, that he relied on that promise, that the reliance was reasonable and foreseeable, and that he suffered injury on account of the reliance.'" *Godfrey*, 2015 WL 7570209, at *2 (citation omitted).

The Court finds that Defendants entered into and breached the Employment Agreement with Harrington. Although the Employment Agreement by its terms describes the parties' relationship as

---

[3] Harrington also alleges claims for Unjust Enrichment (Count VII) and Quantum Meruit (Count X). (Doc. No. 1 at ¶¶ 113-19, 139-42.) In his Motion, Harrington acknowledges that "[t]o the extent there is an enforceable employment agreement in this matter, it is not necessary for the Court to address [the] unjust enrichment and quantum meruit claims, which were plead in the alternative." (Doc. No. 19 at PageID# 104.)

being one of "at-will" employment (*see* Doc. No. 19-1 at PageID# 125), the Employment Agreement nonetheless specifies a $75,000 salary, a $5,000 starting bonus, and an "incentive stock option (ISO) for 25,000 options." (*Id.* at PageID# 123.) "Defendants entered into a contract of employment with Harrington whereby Harrington performed compensable work for Defendants in exchange for Defendants['] promise to pay Harrington a salary, bonus, stock options, and to provide Harrington with health benefits." (Doc. No. 1 at ¶ 109.) Harrington satisfied his obligations pursuant to the contract, actual and implied, by performing work for Defendants. (*Id.* at ¶ 110.) Defendants breached the contract by failing to provide Harrington with any of the compensation or benefits they promised to provide him in exchange for his work. (*Id.* at ¶ 111; *see also* Doc. No. 19-1.) Moreover, as to promissory estoppel, the Court finds that Defendants made a clear and unambiguous promise to Harrington and that Harrington reasonably and foreseeably relied on that promise to his detriment, suffering damages.

Harrington argues that having worked for free for six months, he suffered damages as follows: $38,943.00 in unpaid salary and a $5,000.00 starting bonus; the reasonable value of health benefits ($312.00 per month for 6 months, for a total of $1,872.00)[4]; and reimbursement for $150.00 in expenses related to the purchase of Microsoft Office software that Harrington needed to perform his duties. (Doc. No. 19 at PageID#s 103-04; Doc. No. 19-1 at PageID# 118, ¶ 14.).[5] Altogether, Harrington maintains that he is entitled to $45,965.00 on his breach of contract claim, but based upon

---

[4] Harrington avers that in 2019, he had insurance through the Health Insurance Marketplace, also known as "Obamacare," for which he paid $312.00 per month for these benefits. "Because I was never provided with benefits through Bright Query, I continued to incur this cost." (Doc. No. 19-1 at PageID# 120, ¶ 52.)

[5] As to the stock options referenced in the Employment Agreement, Harrington indicates that "[i]t is unclear how one would value 25,000 options in Bright Query or whether such stock[s] even exist. Accordingly, for the purpose of Default Judgment only, Harrington is forgoing any damages that might be associated with Defendants' failure to provide this benefit." (Doc. No. 19 at PageID# 104, n.17.)

11

the Court's calculation using Harrington's purported methodology (*see* Doc. No. 19 at PageID# 106, n.26), the actual amount is $44,522.00.[6] In addition, as explained *infra*, in calculating the *total* relief to which he is entitled, Harrington subtracts any calculated unpaid wages under the FLSA and related statutes from the contract damages amount.

### C. Violations of the FLSA, OMFWSA, and Ohio Prompt Payment Act

In his Complaint, Harrington also sets forth claims for violations of the FLSA minimum wage and overtime requirements (Counts I and II), the OMFWSA minimum wage and overtime requirements (Counts III and IV), and the Ohio Prompt Payment Act (Count V). (Doc. No. 1 at ¶¶ 71-107.) In his Motion, Harrington argues that although he was promised a salary, he was never paid the salary and therefore was "not paid on a 'salary basis' such that he was exempt from the minimum wage provisions of the FLSA and the OMFWSA." (Doc. No. 19 at PageID# 109.) Under these statutes, Harrington was entitled to a minimum wage of $8.70 per hour for each hour he worked in a given week, up to the first forty (40) hours. (Doc. No. 19 at PageID# 109; 29 U.S.C. § 206; Ohio Const., art. II, § 34a; R.C. § 4111.01.) Further, Harrington asserts that he is entitled to liquidated damages in an amount equal to his unpaid minimum wages, pursuant to 29 U.S.C. § 216(b). (Doc. No. 19 at PageID# 109.) Section 216(b) provides in relevant part:

> Any employer who violates the provisions of section 206 or section 207 of this title shall be liable to the employee or employees affected in the amount of their unpaid minimum wages, or their unpaid overtime compensation, as the case may be, and in an additional equal amount as liquidated damages.

---

[6] In Footnote 26 at PageID# 106 of his Motion, Harrington reaches his figure by first taking the promised $75,000 salary and dividing it for a prorated period of 6 months. ($75,000.00/12 = $6,250 (x 6 months) = $37,500.00). Next, Harrington would add the average cost of health insurance benefits for 6 months to that figure. ($37,500.00 + ($312.00 * 6) = $39,372.00). Adding in the expected $5,000.00 starting bonus and the $150 expense reimbursement for Microsoft Word ($39,372.00 + $5,000.00 + $150.00), this actually equals $44,522.00.

12

29 U.S.C. § 216(b).

Additionally, Harrington alleges that Bright Query violated the Ohio Prompt Payment Act ("OPPA"), R.C. § 4113.15, in that he was not paid all wages due within thirty (30) days of his performing the work that entitled him to the wages. "The [OPPA], among other requirements, requires employers in Ohio to pay their employees the preceding month's wages by the first day and fifteenth day of the month." *Stang v. Paycor, Inc.*, --- F. Supp. 3d ---, 2022 WL 255734, at *3 (S.D. Ohio Jan. 27, 2022) (citing R.C. § 4113.15(A)). "Courts interpret overtime claims brought under the [OPPA] in tandem with the FLSA and in a unitary fashion." *Id.* The OPPA also provides in relevant part that, "Where wages remain unpaid for thirty days beyond the regularly scheduled payday . . . the employer, in addition, as liquidated damages, is liable to the employee in an amount equal to six per cent of the amount of the claim still unpaid and not in contest or disputed or two hundred dollars, whichever is greater." R.C. § 4113.15(B).

The Court finds that Defendants are liable for violations of the FLSA, OMFWSA, and OPPA. Harrington was not exempt from the right to receive minimum wages and overtime wages under the FLSA and OMFWSA and Defendants are liable due to their nonpayment of wages. (Doc. No. 1 at ¶¶ 74-76, 82-84, 92-95, 101-02.). "Defendants' failure and refusal to pay Harrington wages was willful, intentional, and not in good faith." (*Id.* at ¶ 77.) Moreover, Bright Query is liable for violating the OPPA as Harrington was not paid all wages due within thirty (30) days of his performing the work deserving of those wages. (*Id.* at ¶ 105.)

In his Declaration, Harrington sets forth in detail the amount of hours he worked each week between May 15, 2019 and November 15, 2019. (Doc. No. 19-1 at PageID#s 118-19, ¶¶ 17-44.) Harrington worked a total of 992 hours as part of his employment with Defendants. (*Id.* at PageID#

122, ¶ 62.) Multiplying 992 hours by the minimum wage of $8.70, Harrington argues that he is entitled to $8,630.40 under the statutes. (Doc. No. 19 at PageID# 109.) Moreover, under the FLSA's liquidated damages provision, this amount of unpaid wages would be doubled, to equal $17,260.80. (*Id.*) Lastly, Harrington maintains that under the OPPA, six percent interest on his unpaid wages, excluding the value of benefits, totals $2,636.58. (Doc. No. 19 at PageID# 115.) However, using the Court's adjusted calculations, the Court will impose six percent interest under the OPPA in the amount of $2,032.17.[7]

### D. Fraud

Harrington also sets forth a fraud claim against Defendants (Count IX). (Doc. No. 1 at ¶¶ 125-38.) In Ohio, "[t]he elements of an action in actual fraud are: (a) a representation or, where there is a duty to disclose, concealment of a fact, (b) which is material to the transaction at hand, (c) made falsely, with knowledge of its falsity, or with such utter disregard and recklessness as to whether it is true or false that knowledge may be inferred, (d) with the intent of misleading another into relying upon it, (e) justifiable reliance upon the representation or concealment, and (f) a resulting injury proximately caused by the reliance." *Goodwin v. Am. Marine Express, Inc.*, No. 1:18-cv-1014, 2021 WL 848948, at *24 (N.D. Ohio Mar. 5, 2021) (quoting *Gaines v. Preterm-Cleveland, Inc.*, 33 Ohio St.3d 54, 55, 514 N.E.2d 709 (1987)). Harrington argues that his fraud claim is "based on Defendants['] intention not to perform under the [E]mployment [A]greement at the time it was entered into." (Doc. No. 19 at PageID# 107.) Although fraud is generally predicated on a

---

[7] Harrington represents that his proposed six percent interest is calculated using a wage claim figure of $43,943.00. (Doc. No. 19 at PageID# 115 n.86.) However, using the Court's calculations, the difference between Harrington's contract claim ($44,522.00) and statutory minimum wages ($8,630.40) is $35,891.60. After subtracting the value of healthcare benefits ($1,872.00) and expense reimbursement ($150.00), six percent (6%) of that wages figure ($33,869.60 x 0.06) = $2,032.17.

14

misrepresentation relating to a past or existing fact and not upon promises or representations relating to future actions, "[a]n exception to this rule exists, however, where an individual makes a promise concerning a future action, occurrence, or conduct and, at the time he makes it, has no intention of keeping the promise." *RAE Assocs., Inc. v. Nexus Commc'ns, Inc.*, 36 N.E.3d 757, 762 (Ohio Ct. App. 2015) (quoting *Williams v. Edwards*, 717 N.E.2d 368, 374 (Ohio Ct. App. 1998)). "In such a case, the individual possesses actual fraudulent intent and a claim for fraud may be asserted against him." *Id.* "'Fraud can lead to both compensatory damages and punitive damages,' and '[a] person injured by fraud is entitled to such damages as will fairly compensate him for the wrong suffered.'" *Curran v. Vincent*, 885 N.E.2d 964, 968-69 (Ohio Ct. App. 2007) (citations omitted).

Here, Defendants represented and promised to Harrington that he would receive compensation and other benefits in exchange for his work. Specifically, that he would receive a salary, bonus, stock options, and other benefits. (Doc. No. 1 at ¶ 126.) Defendants' offer to employ and compensate Harrington "was a deliberate scam, designed to obtain free labor, that Defendants have perpetrated in one form or another for years against countless victims." (*Id.* at ¶ 127.) When Harrington inquired about Defendants' failure to pay him, Plehn "took additional steps to convince Harrington" that he and Bright Query would compensate Harrington when they got "funding" from an "investor." (*Id.* at ¶ 128.) Harrington alleges that Defendants continually provided him with false information so that they could incentivize him to continue working for them without pay, and that Defendants knew or should have known that their representations were false. (*Id.* at ¶¶ 129-30.) Moreover, Defendants are alleged to have had no intention of paying Harrington anything when they hired him, but fraudulently represented otherwise to Harrington, including making up the existence of stock options "in order to make . . . Bright Query appear to be sophisticated and to create a more

enticing offer for Harrington to work for free." (*Id.* at ¶¶ 131-32.) "Defendants had no intention of providing Harrington with health insurance benefits, but nonetheless fraudulently told Harrington he would receive such benefits in order to obtain free labor from him." (*Id.* at ¶ 133.) Harrington alleges that Defendants intentionally and knowingly deceived him, with actual malice, in that they never intended to pay him anything for his work. (*Id.* at ¶ 134.) "The representations made by Defendants were as to existing material facts, upon which Defendants intended Harrington to rely." (*Id.* at ¶ 135.) Harrington justifiably relied on these fraudulent representations and sustained damages as a direct and proximate result. (*Id.* at ¶¶ 136, 138.)

With regard to potential punitive damages due to Defendants' fraud, "Harrington suggests that the Court consider doubling its award of compensatory damages, much like awarding liquidated damages under the FLSA." (Doc. No. 19 at PageID# 108.) Using the Court's calculation of compensatory damages on the contract claim (i.e., $35,891.60, which is the difference between the contract claim and the minimum wage damages), Harrington's proposed punitive damages (i.e., a doubling of the compensatory damages) would therefore be $35,891.60. However, in Ohio, "[a] trial court lacks authority to award punitive damages in the absence of evidence supporting the punitive damage award." *Kelley v. Sullivan*, No. 106189, 2018 WL 1779373, at *2 (Ohio Ct. App. 8th Dist. Apr. 12, 2018) (citing *Carr v. Charter Nat'l Life Ins. Co.*, 488 N.E.2d 199 (Ohio 1986)). "Where a damages claim is 'liquidated' or based on a readily ascertainable amount, such as an account, no additional proof is necessary." *Id.* (citation omitted). However, "[p]unitive damages are, by nature, unliquidated and thus require additional evidence to establish an appropriate amount." *Id.* "In determining an appropriate amount of punitive damages, the trial court must consider the 'reprehensibility of the defendant's conduct, the disparity between the harm suffered by the plaintiff

16

and the amount of the punitive damages award, and the difference between the punitive damages award and civil or criminal penalties authorized or imposed in similar cases.'" *Id.* (citing *Dardinger v. Anthem Blue Cross & Blue Shield*, 781 N.E.2d 121, 140 (Ohio 2002)). "The plaintiff bears the burden of establishing entitlement to punitive damages by clear and convincing evidence." *Id.*

Although the Court finds Defendants liable for fraud based upon the well-pleaded allegations in the Complaint, the Court has not been presented with sufficient evidence on which to assess potential punitive damages. On the basis of the limited record and evidence before the Court, and in light of the default judgment procedural posture, the Court declines to impose punitive damages for Harrington's fraud claim.

### E. Attorney's Fees and Costs

In addition to unpaid wages and liquidated damages, Harrington seeks an award of attorney's fees and costs. (Doc. No. 19 at PageID#s 112-15.) The FLSA provides that, "[t]he court . . . shall, in addition to any judgment awarded to the plaintiff or plaintiffs, allow a reasonable attorney's fee to be paid by the defendant, and costs of the action." 29 U.S.C. § 216(b); *see also* R.C. § 4111.10(A) (providing for "costs and reasonable attorney's fees"). "'The most useful starting point for determining the amount of a reasonable fee' is the lodestar method." *Thomas v. GC Restaurants, LLC*, No. 3:20-cv-300, 2021 WL 4147818, at *3 (S.D. Ohio Sept. 13, 2021) (quoting *Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983)). "That figure is reached 'by multiplying the reasonable number of hours billed by a reasonable billing rate.'" *Id.* (quoting *Paschal v. Flagstar Bank*, 297 F.3d 431, 434 (6th Cir. 2002) (quotation omitted)).

Counsel for Harrington, Attorney Chris Wido ("Wido"), represents that he expended 46.19 billable hours on this case, which "is not unreasonable for a case such as this one, in which Harrington

17

asserted complex claims not only related to Defendants' failure to pay Harrington his wages." (Doc. No. 19 at PageID# 113; Doc. No. 19-3 (Decl. of Chris Wido) at PageID#s 131-32, ¶ 13.) Wido's billable rate in this matter was $375.00 per hour, which is below the $550.00 per hour amount called for in Harrington's contingency fee contract with The Spitz Law Firm, LLC for Partners like Wido. (Doc. No. 19 at PageID# 114; Doc. No. 19-3 at PageID#s 131-32, ¶¶ 8, 17, 22.) Wido avers that The Spitz Law Firm has not been paid anything for its work in this matter thus far and that the firm assumed all risk in this matter as it relates to the costs of litigation. (Doc. No. 19-3 at PageID# 131, ¶¶ 6-7.) The total amount of attorney's fees Harrington requests is $17,271.25 and that amount is reflected in Wido's billable time entries attached to the Motion. (Doc. No. 19-3 at PageID#s 141-43.)

Moreover, Harrington seeks costs incurred through the litigation, including a $402.00 filing fee, $42.14 in costs related to service, and $252.00 in administrative costs. (Doc. No. 19 at PageID# 115.) Harrington therefore seeks a total of $696.14 in costs. (*Id.*) This makes for a combined total of $17,967.39 in attorney's fees and litigation costs.

The Court finds that Harrington's evidence is sufficient to establish damages in the amount of $17,260.80 (representing unpaid wages and liquidated damages under the FLSA and OMFWSA); $35,891.60 (representing the difference between Harrington's contract damages and his minimum wage damages); and $2,032.17 (as six percent interest on Harrington's unpaid wages, excluding the value of benefits, under the OPPA). Further, Harrington has submitted sufficient evidence to establish his entitlement to reasonable attorney's fees and costs in the amount of $17,271.25 and $696.14, respectively. The Court declines to assess the punitive damages Harrington seeks on his fraud claim.

**IV.     Conclusion**

Plaintiff's Motion for Default Judgment (Doc. No. 19) is GRANTED IN PART AND DENIED IN PART. Default judgment is entered in Plaintiff's favor against Defendants, jointly and severally, for $55,184.57 in damages[8] and $17,967.39 in attorney's fees and costs, equaling a combined total sum of $73,151.96.

**IT IS SO ORDERED.**

Date: February 15, 2022

   s/Pamela A. Barker
PAMELA A. BARKER
U.S. DISTRICT JUDGE

---

[8] This figure is the combined total of the adjusted contract claim wages ($35,891.60), the six percent OPPA interest on the wages figure excluding the value of benefits ($2,032.17), and the minimum wage and liquidated damages amount ($17,260.80). The Court declines to impose punitive damages.